IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>   vs.<br><br>DANIEL JOSEPH RIOS,<br><br>              Defendant. | CR. NO. 19-00006 JAO<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR REDUCTION OF SENTENCE** |

**ORDER DENYING DEFENDANT'S MOTION FOR REDUCTION OF SENTENCE**

Defendant Daniel Joseph Rios ("Defendant") filed a Motion for Reduction of Sentence ("the Motion"), seeking compassionate release pursuant to 18 U.S.C. § 3582. ECF No. 41. The Court decides this motion without a hearing pursuant to Local Rule 7.1(c). For the following reasons, the Motion is DENIED.

I.    BACKGROUND

    A.    Procedural History

On January 14, 2019, the Government filed an Information charging Defendant with violating 21 U.S.C. § 846—Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A). ECF No. 14. Defendant waived indictment and pled guilty pursuant to a Memorandum of Plea Agreement ("Plea

Agreement"). ECF Nos. 17–19. On May 8, 2019, the Court sentenced Defendant to a term of 120 months in custody and five years of supervised release. ECF No. 37. Defendant is currently incarcerated at Federal Correctional Institution Victorville Medium I ("FCI Victorville"). *See* Federal Bureau of Prisons, https://www.bop.gov/inmateloc (follow "Find By Name" tab; then search for "Daniel Joseph Rios") (last visited Jan. 14, 2021).

Defendant filed the Motion on December 10, 2020. ECF No. 41. The Government filed a Response on December 23, 2020. ECF No. 46. Defendant filed a Reply on December 28, 2020. ECF No. 47.

    B.    Defendant's Background

        1.    Defendant's Current Condition

It is undisputed that Defendant is 35 years old, has a Body Mass Index ("BMI") of more than 50, which means that he is severely obese, and tested positive for COVID-19 in August. *See* ECF No. 41 at 5–7; ECF No. 46 at 6–7. Defendant's COVID-19 symptoms included a sore throat, coughing, muscle aches, loss of taste and smell, and chills. ECF No. 41 at 5–6. However, throughout his COVID-19 diagnosis, his temperature and oxygen levels were consistently normal. ECF No. 46 at 22. He was also diagnosed with acute bronchitis, *see* ECF No. 41 at 5, although the Government posits that this condition was the result of Defendant's contracting COVID-19, and is managed, *see* ECF No. 46 at 21. Finally, Defendant

likely has high blood pressure but has not yet been diagnosed as hypertensive. *See* ECF No. 41 at 8.

        2.      Defendant's History and Post-sentencing Behavior

In his Plea Agreement, Defendant admitted that, over the course of more than a year, Defendant engaged in a conspiracy to ship methamphetamine via the U.S. Postal Service from California to Hawaiʻi for distribution. ECF No. 19 at 5. His co-conspirators received the packages, sold the drugs, and sent the proceeds back to him. *See id.* In November 2018, Defendant sent two packages to Kauaʻi, and each package contained between 500 and 600 grams of methamphetamine. *See id.* at 5–6. He flew to Kauaʻi to retrieve the packages, which were intended for further distribution. *See id.* at 6.

Defendant has served approximately 26 months of his 120-month sentence. *See* ECF No. 41 at 5. His scheduled release date is May 17, 2027. *See* Federal Bureau of Prisons, https://www.bop.gov/inmateloc (follow "Find By Name" tab; then search for "Daniel Joseph Rios") (last visited Jan. 14, 2021).

Since his incarceration, Defendant has made efforts to improve himself by taking many classes, including those aimed at parenting skills, coping with grief, and employment. *See* ECF No. 41-6.

C.    Conditions at FCI Victorville

As of this writing, FCI Victorville has 52 active cases among inmates and 35 active cases among staff.  *See* Federal Bureau of Prisons, https://www.bop.gov/coronavirus (mouse over "FCC Victorville" and scroll to "FCI Victorville Medium I") (last visited Jan. 14, 2021).  It presently has a population of 989 inmates.  *See* Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/vim (last visited Jan. 14, 2021).  While this suggests a current five-to-six percent rate of infection among inmates, it does not take into account the total number of inmates who have been infected at FCI Victorville since the beginning of the pandemic, which appears to be approximately 600.[1]  *See* Federal Bureau of Prisons, https://www.bop.gov/coronavirus (click on "Full breakdown and additional details") (last visited Jan. 14, 2021).

II.    DISCUSSION

A.    Exhaustion of Administrative Remedies

Under Section 3582(c)(1)(A), a defendant seeking compassionate release must "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).  Defendant bears the burden of establishing

---

[1] *See infra* note 3.

the exhaustion requirement.  *See United States v. Van Sickle*, No. CR18-0250JLR, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020); *United States v. Tafoya-Ramos*, No. 1:15-CR-0288-AWI-SKO-6, 2020 WL 7425341, at *2 (E.D. Cal. Dec. 18, 2020).

The Government contends that Defendant's statement in an exhibit attached to the Motion is insufficient to establish that he exhausted his administrative remedies.  *See* ECF No. 46 at 18.  The Government further argues that any statement Defendant offers about his administrative efforts necessarily must comply with 28 C.F.R. § 571.61(a), but offers no caselaw in support of this position.

District courts have accepted an inmate's word about his exhaustion of remedies, and have not required documentation nor much detail of such exhaustion.  *See, e.g., United States v. Cornelio*, No. 17-cr-00321-DKW, 2020 WL 6021466, at *2 (D. Haw. Oct. 12, 2020); *United States v. Akolo*, CR. NO. 13-00653-SOM-10, 2020 WL 4810104, at *2 (D. Haw. Aug. 18, 2020).  Here, Defendant informs the Court via a letter to counsel dated November 28, 2020, that he "already sent a compassionate release request to the Warden T. Jusino . . . on or about Oct. 08, 2020" and that he was "yet to receive any response."  ECF No. 47-1 at 3 (some capitalization omitted).  The Court finds this sufficient under the circumstances here, where the only factual response the Government offers is a

similarly unsworn statement that the BOP does not have a record of a request. The time sensitive nature of the motion, the widespread BOP shutdowns, and limited communication avenues for defense counsel to speak to their clients also weigh in favor of concluding that Defendant exhausted his administrative remedies under the facts here. *See Akolo*, 2020 WL 4810104, at *3.

    B.    Whether a Sentence Reduction Is Warranted

        1.    The Function of United States Sentencing Guidelines Section 1B1.13

Prior to the passage of the First Step Act, only the BOP could move for an inmate's compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A) (2012). But the First Step Act amended, among other things, 18 U.S.C. § 3582(c)(1)(A), which now allows inmates to seek compassionate release:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –
>
>     (i)    extraordinary and compelling reasons warrant such a reduction; . . .
> *and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*[.]

18 U.S.C. § 3582(c)(1)(A) (2018) (emphasis added).

United States Sentencing Guidelines ("USSG") section 1B1.13 ("the Guideline") addresses Section 3582 motions, but the Sentencing Commission has not updated the Guideline since the passage of the First Step Act.[2]  The Guideline allows for a sentence reduction for compassionate release "[u]pon motion of the Director of the Bureau of Prisons . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that . . . extraordinary and compelling reasons warrant the reduction[.]"  USSG § 1B1.13. It further outlines four categories of extraordinary and compelling reasons in the application notes:  the defendant's medical condition, the defendant's age (at least 65 years old), family circumstances, and "other reasons."  *Id.*, comment. (n.1). This last category is known as the "catch-all" clause.  *United States v. Brooker*, 976 F.3d 228, 232 (2d Cir. 2020).  The Guideline notes also explain that the catch-all clause applies when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the [other] reasons[.]"  USSG § 1B1.13, comment.

---

[2]  The Commission's failure to amend the Guideline is likely due to its lack of sufficient members for a quorum.  *See U.S. Sentencing Commission*, "About the Commissioners," https://www.ussc.gov/commissioners (last visited Jan. 14, 2021) (listing only 1 voting commissioner); *U.S. Sentencing Commission*, "Organization," https://www.ussc.gov/about/who-we-are/organization (last visited Jan. 14, 2021) ("The affirmative vote of at least four members of the Commission is required to promulgate amendments to the sentencing guidelines.").

(n.1). In other words, according to the Guideline, wide discretion regarding what constitutes an "extraordinary and compelling reason" rests only with the BOP Director.

The change in the compassionate release statute and lack of amendment to the Guideline beg the question of whether the Guideline applies to *all* Section 3582 motions—including those brought by defendants. The Court concludes that it does not.

The plain language of the Guideline clearly limits the Guideline's application to compassionate release motions filed by the BOP Director. *See United States v. Cruz-Gramajo*, 570 F.3d 1162, 1167 (9th Cir. 2009) (explaining that the rules of statutory construction apply to the Guidelines and that plain language controls); USSG § 1B1.13 ("Upon motion of the Director . . . ."). And this plain reading now has support from four Circuits and numerous district courts within the Ninth Circuit. *See Brooker*, 976 F.3d at 235 ("Turning to the text of the Guideline § 1B1.13, it is manifest that its language is clearly outdated and cannot be fully applicable. The very first words of the Guideline are '[u]pon motion of the Director of the Bureau of Prisons.'" (alteration in original and citation omitted)); *see United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *8 (6th Cir. Nov. 20, 2020) ("Examining the four corners of § 1B1.13 alone, it becomes immediately apparent that the policy statement does not wholly survive the First

Step Act's promulgation. The first sentence of § 1B1.13 predicates the entire policy statement on the Director of BOP's filing a motion for compassionate release." (citation omitted)); *United States v. McCoy*, Nos. 20-6821, 20-6869, 20-6875, 20-6877, 2020 WL 7050097, at *7 (4th Cir. Dec. 2, 2020); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020) ("Section 1B1.13 addresses motions and determinations of the Director, not motions by prisoners. In other words, the Sentencing Commission has not yet issued a policy statement 'applicable' to Gunn's request. And because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of § 3582(c)(1)(A) does not curtail a district judge's discretion. Any decision is 'consistent with' a nonexistent policy statement."); *see also, e.g.*, *United States v. Parker*, 461 F. Supp. 3d 966, 978–79 (C.D. Cal. 2020) (collecting cases and rejecting the argument "that pre-[First Step Act] categories contained in U.S.S.C. § 1B1.13 limit [a court's] discretion to determine whether an inmate has raised 'extraordinary and compelling' circumstances that justify the modification of her sentence." (quoting *United States v. Wade*, No. 2:99-cr-00257-CAS-3, 2020 WL 1864906, at *5 (C.D. Cal. Apr. 13, 2020)); *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681–82 (N.D. Cal. 2019) (collecting cases); *United States v. Manzo*, Nos. 2:07-CR-02042-LRS-2, 2:07-CR-02071-LRS-1, 2020 WL 6786898, at *2 (E.D. Wash. Nov. 18,

9

2020); *United States v. Hernandez*, CR. NO. 13-00511(1) JMS, 2020 WL 3453839, at *4 (D. Haw. June 24, 2020) (collecting cases).

The plain language of the statute itself does not alter this conclusion. The First Step Act directs the Court to evaluate whether "a reduction is consistent with *applicable* policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). Because the Guideline does not apply here, the Court is not restricted by it or its notes and relies on the direction outlined in the statute. *See McCoy*, 2020 WL 7050097, at *7 ("What § 3582(c)(1)(A) requires is that sentence reductions be consistent with 'applicable policy statements.' And here, that consistency requirement simply is not implicated, for the threshold reason that there currently exists no 'applicable policy statement.'" (brackets omitted)).

Even if the Court were to look past the plain language of both the statute and the Guideline, it is undisputed that the First Step Act was passed in an effort to reduce incarceration, *see generally* 164 Cong. Rec. S7640–50 (daily ed. Dec. 17, 2018); *see also* Congressional Research Service, *The First Step Act of 2018: An Overview* (Mar. 4, 2019), https://crsreports.congress.gov/product/pdf/R/R45558, and that Congress amended Section 3582 in response to the BOP's underwhelming number of compassionate release motions. *See* First Step Act § 603(b), 132 Stat. at 5239 (titled "Increasing the Use and Transparency of Compassionate Release");

*see also Brooker*, 976 F.3d at 233.  Therefore, concluding that the Guideline applies only to motions brought by BOP does not undermine the intent of the passage of the First Step Act and in particular the amendments made to the compassionate release statute.  *See Jones*, 2020 WL 6817488, at *8 ("It would make little sense for the courts to operate as if the BOP remains the sole gatekeeper of compassionate release, which would reflect a bygone era that Congress intentionally amended in the First Step Act.").

Unfettered by USSG § 1B1.13, the Court follows Section 3582(c)(1)(A)'s direction.

                    2.        Defendant's Stated Extraordinary and Compelling Reasons

As an initial matter, defense counsel correctly explains that the question before the Court is not the same question addressed at sentencing.  The Court is not asked to determine whether the sentence previously imposed was "sufficient, but not greater than necessary" to comply with the factors outlined in 18 U.S.C. § 3553(a)(2), but rather, to determine whether "extraordinary and compelling reasons warrant . . . a reduction." 18 U.S.C. § 3582(c)(1).  The Court is then required to evaluate the Section 3553(a) factors to decide whether to reduce a term of incarceration.  *See* 18 U.S.C. § 3582(c)(1)(A).

      a.  Defendant's Health

Defendant purports to have three risk factors: severe obesity, high blood pressure, and acute bronchitis.

      i.  Severe Obesity

Defendant is severely obese. *See* https://www.cdc.gov/obesity/adult/defining.html (defining obesity as a BMI of 30.0 or higher, and a BMI of 40 or higher as "extreme" or "severe" obesity (internal quotation marks omitted)) (last visited January 14, 2021). This condition certainly places Defendant at a higher risk of problematic COVID-19 outcomes. *See* CDC, "People with Certain Medical Conditions," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions%2Fgroups-at-higher-risk.html (last visited Jan. 14, 2021).

      ii.  High Blood Pressure

Defendant points to his high blood pressure as a factor that "likely increases his risk," but admits that he has not yet been diagnosed as hypertensive. ECF No. 41 at 8. His blood pressure appears in his medical records only once—on August 24, 2020—and was 145/85, which is high. *See* ECF No. 41 at 8 (citing Exhibit A); CDC, "High Blood Pressure," https://www.cdc.gov/bloodpressure/about.htm (last visited Jan. 14, 2021). Although this offers a limited window into Defendant's typical blood pressure (especially considering that the blood pressure measurement was during his bout with COVID-19), it seems somewhat unreasonable for the

Court to assume Defendant normally has a healthy blood pressure, particularly in light of his severe obesity. *See, e.g.*, CDC, "Prevent High Blood Pressure," https://www.cdc.gov/bloodpressure/prevent.htm (last visited Jan. 14, 2021) ("Having . . . obesity increases your risk for high blood pressure."). According to the CDC, people with high blood pressure might face an increased risk of severe illness from COVID-19, *see* CDC, "People with Certain Medical Conditions," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions%2Fgroups-at-higher-risk.html (last visited Jan. 14, 2021).

### iii. Acute Bronchitis

Defendant's acute bronchitis diagnosis coincided with his COVID-19 diagnosis. Acute bronchitis may also be called a "chest cold," typically lasts less than three weeks, *see* CDC, "Chest Cold (Acute Bronchitis)," https://www.cdc.gov/antibiotic-use/community/for-patients/common-illnesses/bronchitis.html (last visited Jan. 14, 2021), and sometimes includes a cough that lasts up to eight weeks. *See Johns Hopkins Medicine*, "Acute Bronchitis," https://www.hopkinsmedicine.org/health/conditions-and-diseases/acute-bronchitis (last visited Jan. 14, 2021). Bronchitis is not listed as a risk factor of increased risk for severe illness from COVID-19 according to the CDC, and the Court does not weigh it as such.

iv.          Defendant's Prior COVID-19 Diagnosis

Despite his COVID-19 diagnosis in August, Defendant's oxygen levels and temperature were consistently in normal range. He suffered through, among other things, a cough, chills, body aches, and a sore throat. The Court cannot predict whether reinfection would result in the same or more serious symptoms, and so considers his prior COVID-19 diagnosis only as demonstrating that he has not been adequately protected from COVID-19 at FCI Victorville, and can suffer symptoms from it.

The Court therefore finds that the combination of Defendant's medical conditions places him at greater risk of severe illness from COVID-19.

b.          Conditions at FCI Victorville

The Conditions at FCI Victorville are concerning. On January 12, 2021, the BOP reported that FCI Victorville had a total of 89 active positive inmate cases, with 580 inmates who had recovered from COVID-19. *See* Federal Bureau of Prisons, https://www.bop.gov/coronavirus (click on "Full breakdown and additional details") (accessed on Jan. 12, 2021). This means that approximately 600 inmates at FCI Victorville have contracted COVID-19 since the beginning of the pandemic, and the facility currently has 989 total inmates.[3]

---

[3] The Court uses the word "approximately" because these statistics do not indicate the number of inmates who have been reinfected.

The Government does not attempt to argue that FCI Victorville does not have a COVID-19 problem; rather, it contends that: (1) "[a]n outbreak at a facility . . . is not in itself a basis to find an extraordinary and compelling reason warranting compassionate release"; (2) the BOP's efforts at limiting COVID-19 infections in its facilities "have been substantial;" and (3) Defendant's release plan to California would only place him at greater risk because of California's alarming rate of infection. ECF No. 46 at 24–25.

The Court agrees that an outbreak at a facility would not alone serve as a basis for compassionate release. But Defendant has not argued that he should be released solely because of the conditions at FCI Victorville. Indeed, most of Defendant's Motion focuses on his health. And of course the facility's conditions must necessarily play a role in the analysis here.

The Government points to the BOP's "substantial" efforts at limiting COVID-19 but appropriately does not characterize such efforts as effective. If its efforts were effective, there would not have been approximately 600 cases of COVID-19 at FCI-Victorville, nor more serious outbreaks at other facilities. *See*, *e.g.*, Richard Winton, "Coronavirus outbreak at Terminal Island prison worsens: 5 dead, 600 infected," *Los Angeles Times*, https://www.latimes.com/california/story/2020-04-30/la-coronavirus-outbreak-terminal-island-prison-worsens (last visited Jan. 14, 2020). While there surely is ongoing debate about whether the BOP's

efforts have been "substantial," it cannot reasonably be said that its efforts have been effective. Contending that the BOP's efforts have been "substantial" and so weigh against compassionate release amounts to arguing that the Court should not grant compassionate release in any case because the BOP has at least *tried* to curb COVID-19. Trying and doing are two different things.

Finally, the Government's contention that releasing Defendant into California presents a worse danger than leaving him in FCI Victorville ignores the realities of prison life. *See United Sates v. Powell*, 468 F. Supp. 3d 398, 405 (D.D.C. 2020). Defendant would at the very least be better able to social distance and protect himself from infection if outside of prison.

The Court therefore concludes that Defendant's health and the conditions at FCI Victorville place him at an increased risk of contracting COVID-19 and suffering greater harm from it. In other words, there are extraordinary and compelling reasons for the Court to consider a sentence reduction. The Court thus turns to the Section 3553(a) factors to determine what reduction or modification, if any, is warranted.

    1.    Section 3553(a) Factors

*The nature and circumstances of the offense and the history and characteristics of the defendant*

It is impossible to quantify methamphetamine's devastation in the islands. Perhaps more than any other drug, it has severely (and in many cases permanently)

damaged our families and communities. Defendant contributed to this by mailing pounds of methamphetamine to the small community of Kauaʻi, and profited from it. Additionally, Defendant was a leader of the conspiracy, directing the activities of others.

In mitigation, Defendant's crime involved neither violence nor guns and the conspiracy was rather small.

As the Court stated at the sentencing hearing, Defendant has a lengthy and concerning criminal history, including violent firearm activity. He also did not previously perform well while under supervision. In mitigation, Defendant faced a difficult childhood and has made strides since incarceration to rehabilitate, most notably his work on parenting skills and improving his job opportunities upon release from custody. The Government has not offered any evidence that he has had any disciplinary issues since incarceration.

> *The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense*

Defendant has served only a small fraction of his total sentence here. And the Court recognizes that it departed significantly downward from the advisory Guidelines range when imposing sentence—sentencing Defendant to the mandatory minimum, which was less than half of Defendant's guidelines range. A sentence of incarceration of just over two years does not promote respect for the

law, particularly given the dangerousness of methamphetamine, the amount of methamphetamine involved in Defendant's crime, and his criminal history.

*The need to afford deterrence to criminal conduct and to protect the public from further crimes of defendant*

Defendant was thirty-two years old when he committed the offense here and is now only thirty-five. While, as stated above, he has made efforts in prison to improve, Defendant's lengthy criminal history and failures while under supervision weigh against concluding that the requested sentence reduction is warranted.

*The need to avoid unwarranted sentencing disparities*

Releasing Defendant now would result in an unwarranted sentencing disparity. Defendant's underling, Dawson Carvalho, who played a significantly smaller role, answered to Defendant, and had only one prior conviction for a property crime which was later expunged, received a sentence of twelve months. *See* CR No. 19-00005 JAO, ECF No. 30. A sentence of only 16 months longer than Carvalho's would indeed result in a disparity in this matter, even after considering the COVID-19 pandemic.

In sum, the Section 3553 factors weigh against a reduction of Defendant's sentence to time served. Further, in particular, Defendant's lengthy criminal history despite his young age, which includes violent firearm activity and leadership of the instant drug conspiracy, and past inability to comply with requirements under supervision, demonstrate to the Court that a modification of

Defendant's remaining sentence to probation would not result in a sentence sufficient to comply with the purposes of the Section 3553 factors even in the light of the extraordinary and compelling reasons discussed above.

III.   CONCLUSION

For the foregoing reasons, the Court DENIES the Motion.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, January 14, 2021.



Jill A. Otake
United States District Judge